IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 27, 2020

**STATE OF TENNESSEE v. JOSHUA HURT**

**Appeal from the Criminal Court for Knox County**
**No. 109705   Steven Wayne Sword, Judge**

_____

**No. E2020-00236-CCA-R3-CD**

_____

The Defendant-Appellant, Joshua Hurt, was convicted by a Knox County jury of attempted voluntary manslaughter (Count 1), in violation of Tennessee Code Annotated section 39-13-211, as a lesser included offense of attempted first-degree murder, employment of a firearm during the commission of or attempt to commit a dangerous felony (Count 2), possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony (Count 3), in violation of Tennessee Code Annotated section 39-17-1324, and two counts of especially aggravated robbery (Counts 4 and 5), in violation of Tennessee Code Annotated section 39-13-403. The trial court merged Counts 4 and 5 and sentenced the Defendant to seventeen years' imprisonment for these counts, merged Count 3 into Count 1 and sentenced the Defendant to four years' imprisonment for these counts to run concurrently to Count 4, and six years' imprisonment for Count 2 to run consecutively to Count 1, for a total effective sentence of seventeen years' imprisonment. In this appeal as of right, the Defendant raises the following issues for our review[1]: (1) whether the evidence is sufficient to sustain the Defendant's convictions for especially aggravated robbery, and (2) whether the trial court erred in (a) not giving the appropriate definition of serious bodily injury and (b) instructing the jury on flight. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ALAN E. GLENN, JJ., joined.

Joshua Hedrick, Knoxville, Tennessee, for the Defendant-Appellant, Joshua Hurt.

---

[1] We have reordered the Defendant's issues for the sake of clarity.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Charme Allen, District Attorney General; and Phillip Morton, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

After leaving a house party together, the Defendant, the victim, and their friend, Ciara Reynolds, went to Reynolds' house, where the Defendant called a friend to give him a ride. When the Defendant's friends, codefendants James McCoy and Couron Bennett[2], arrived, the Defendant retrieved a gun from their car, confronted the victim, and shot him five times. The victim was treated for gunshot wounds to his arm and legs and had trouble walking for months afterwards, among other injuries. The Defendant insisted that he confronted the victim with a gun because the victim had lied to the Defendant about having possession of the Defendant's gun, and the Defendant shot the victim in self-defense. The following proof was adduced at the Defendant's trial, which took place from April 10-12, 2018.

Secolia Johnson, the victim's mother, responded to the hospital on May 8, 2016, following an incident in which her son was shot five times in his legs and arm. Due to his injuries, the victim was required to leave the hospital in a wheelchair, and his mother took the victim to her daughter's house, where the victim stayed for a week. During this time, the victim's mother had to lift him up to use the bathroom and bathe him, and she testified that the victim lost the use of the right side of his body, including the ability to write with his right hand. Johnson testified that the victim used a wheelchair for approximately two months and used crutches for another two months because his foot was broken. She said the victim was in "a lot of pain" the first time he tried to put pressure on his foot after he was shot, so she took him to the hospital, where he was x-rayed and diagnosed with a broken foot. She believed that she last saw the victim walking normally on his foot a day or two before he was shot. She estimated that the victim did not regain full use of his legs for six to seven months, and he could not use his hand for over a year.

On cross-examination, Johnson agreed that the victim was in the hospital for a total of four to five hours. She estimated that the victim noticed that he could not walk on his foot about a week after he was shot. She stated that the victim would have been in a wheelchair at a court hearing in October 2016. The Defendant introduced the victim's medical records into evidence. Johnson stated that she was not present at the hospital when the victim had x-rays done after he was shot, but she assumed that he had x-rays done since he was shot. She said she was "angry at the hospital because [the victim] was bleeding out and they were pushing him out of the hospital as if he had just cut his finger." She was also angry that the hospital did not x-ray his foot "to know that they sent him home with a

_____

[2] Codefendants McCoy and Bennett were tried jointly with the Defendant.

broken foot." Johnson believed that the victim regained the full use of his hand in the early part of 2017. She was unsure if the victim was making music videos or performing in 2016, but she was adamant that she took care of the victim "the whole time." Upon further questioning, she said, "for the most part, every move that [the victim] made, I had to transport him for several months." She agreed that he could have been making music videos during that time, but she insisted that he was not performing in shows during 2016 after he was shot. On redirect examination, Johnson said that she did not know where the victim was at that time.

Ciara Reynolds testified that she had known the Defendant and codefendants McCoy and Bennett for many years. She knew the victim in May 2016, and she and the victim had been "close friend[s]" for a year or two. On May 7, 2016, the victim came to Reynolds' house, and they went to a studio on Sutherland Avenue. Reynolds believed that they were at the studio for two to three hours, and she saw the victim with money when he paid for the studio time. They left the studio and went to a house party around 9 or 10 that evening. The Defendant was also present at the party, and Reynolds believed that the Defendant saw the victim pull out his money at the party. Reynolds observed the Defendant arguing with someone at the party, and the victim intervened in the argument. She stated that she did not see the Defendant or the victim in possession of a weapon at the party. She took possession of the victim's money when the police showed up at the party, but she returned the money to him when they got in the car to leave. She said she took the money because she "just felt like he didn't need it in his pocket at the time" because of the commotion at the party.

Reynolds, the victim, and the Defendant left the party in a car with Reynolds' friend and another woman, and they drove to Reynolds' house on Burnside Street. Reynolds identified her home and the house across the street on an aerial photograph, which was entered into evidence. When they arrived at Reynolds' house, she, the victim, and the Defendant got out of the car and went into her garage. She said that, while they were in the car, the Defendant used her phone to make a call for a ride from her house, but she did not know how many calls he placed or what the Defendant said. She later corrected herself and said that the Defendant used her phone when they got to her house. She also said that, while they were in her garage, the victim was "counting his money to make sure it was all there." Eventually, codefendants McCoy and Bennett showed up to Reynolds' house to pick up the Defendant, and she, the Defendant, and the victim walked out to their car. She stated that the car was parked on the street. At first, she only noticed codefendant McCoy sitting in the passenger seat, and she eventually noticed codefendant Bennett in the driver's seat "after everything started happening." Reynolds went to the passenger side of the car, and she believed that the victim went to the driver's side.

- 3 -

Reynolds said that the Defendant went to the passenger side of the car, and she believed he was looking for something under the seat, although she could not see exactly what he was doing. Reynolds then saw the Defendant walk around the front of the car, and she noticed a gun in his hand. The Defendant was pointing the gun at the victim, who was about six to eight feet from the Defendant. Reynolds heard the Defendant say, "You got all that money in your pocket. I need it." The victim responded, "Why you playing[,]" and the Defendant began firing shots at the victim. Reynolds believed that she heard eleven to twelve shots. She ran to her neighbor's house, and she saw the victim moving towards the grass, while the Defendant was following the victim and still shooting at him. At that point, codefendants McCoy and Bennett were driving "up the hill" towards Dakota Avenue. She saw the victim throw his money, and she guessed that the Defendant "went for the money." Reynolds ran into her house, her mother called the police, and she went to try to help the victim. At the time, Reynolds saw that the victim was bleeding, but she believed that he had only been shot twice. She later learned that the victim had been shot five times: once in his right arm, and four times on different parts of his legs.

On cross-examination, Reynolds described the victim as tall and athletic, with long legs and arms. She could not recall if the victim had a holster on him at the party, but she knew he did not have a gun on him. She said that the Defendant left the party with them because he was going to get a ride from her house. Reynolds stated that the victim's friend came to her house sometime after they arrived, but she did not know much about him. Reynolds believed the victim's money was safer with her at the party because she had a purse, and she said that there was only one "disagreement" at the party. She said that codefendants McCoy and Bennett were eating when they pulled up to her house, and it did not "look like they were there for a robbery[.]" The victim's friend was also there when codefendants McCoy and Bennett arrived, but her neighbor did not arrive until after the victim was shot. Reynolds indicated where the victim and the Defendant were standing when the altercation began on a diagram, and noted that they were both closer to the back of the car. Reynolds visited the victim at the hospital after he was shot, and she stated that she saw him regularly after that. She said that the victim did not go to the doctor to get his foot checked until about a month and a half after the Defendant shot him. She also said that that victim was off his foot for a "number of weeks" and that his foot still "[gave] him problems" at the time of the Defendant's trial. She did not believe that the victim was in a wheelchair during fall 2016. She stated that she did not speak to Investigator Chas Terry at the hospital, but she spoke to him the next day. Reynolds stated that they were only at the car for a couple of minutes before the Defendant shot the victim. She did not see the Defendant get into the codefendants' car after the shooting. On redirect examination, Reynolds stated that the victim had around five hundred dollars in cash on him that night.

Officer Jonathan Gomez of the Knoxville Police Department (KPD) testified that he processed the scene and photographed and collected evidence from Burnside Street,

where the crimes in this case occurred. Officer Gomez located a gun at the crime scene near Dakota Avenue, and he located shell casings closer to the "south side." Officer Gomez also took photographs of the crime scene, including four shell casings, the "clothing where the victim was . . . located[,]" a liquor bottle, several blood stains and trails, a black holster that was located inside the victim's clothing, and a wooded area with blood on tree limbs and vegetation. He collected the shell casings and the clothing from the crime scene. Officer Gomez then went to the hospital, where he photographed the victim's injuries. Officer Gomez returned to the crime scene to collect and photograph a gun that was found underneath another officer's vehicle after it was moved. Upon inspection, he could tell that the gun "appear[ed] to have malfunctioned." Officer Gomez stated that there were live rounds in the magazine, but he could not recall how many. He identified the following items, which were also entered into evidence: the gun collected from the crime scene, which was a nine-millimeter Smith & Wesson, five live nine-millimeter rounds found in the magazine, one magazine, a piece of brass that jammed in the gun, and nine-millimeter spent shell casings. Officer Gomez also checked the items for fingerprints using superglue fuming, but he was not able to develop any usable fingerprints. On cross-examination, Officer Gomez agreed that he could not determine how many guns were used that night based on the number of bullets and shell casings found at the crime scene. He agreed that varying circumstances could lead to the shell casings being found in different areas of the crime scene. He did not know what kind of weapon went into the black holster found with the victim's clothes. He stated that he searched the area to see if he could find more shell casings.

KPD firearms examiner Patricia Resig, who testified as an expert in firearms identification, examined the four shell casings collected from the crime scene and determined that they were all fired from the same gun. As for the casing that jammed in the firearm collected from the crime scene, Resig determined that "it could have been actually fired in the same gun as the other four [casings], but there weren't enough of the individual characteristics for [her] to say that it was fired in the same gun." Resig also examined the gun collected from the crime scene, determined that it was a functioning gun, and that "the four casings stated to be from . . . Burnside [Street] were fired in this semiautomatic pistol. And the fifth exhibit that's stated to be jammed in the Smith & Wesson . . . displayed consistent class, some individual, and could have been fired in this gun. However . . . there was not enough matching -- sufficient matching individual characteristics." Resig's report was entered into evidence. On cross-examination, Resig agreed that not all guns eject their casings.

KPD Investigator Chas Terry responded to the hospital on the night of the offense, spoke to the victim, and observed his injuries. He tried to follow up with potential witnesses, and he was eventually able to interview Reynolds. After reviewing the crime scene photographs and evidence and showing photographic lineups to the victim and

Reynolds, Investigator Terry obtained search warrants for the Defendant and codefendants McCoy and Bennett. Investigator Terry interviewed codefendant McCoy, who he knew previously, and the video recording, as well as the rights waiver form, were entered into evidence. Investigator Terry explained that codefendant Bennett went by the nickname "Chaos," codefendant McCoy went by the nickname "Rambo," and the victim went by the nickname "Kill." He also explained that a "big homey" was "kind of like a handler;" "A Homes" referred to Austin Homes, a community on the east side of Knoxville; and that "throwing up wings" referred to "Gangster Disciple hand signs." He stated that the Gangster Disciples ("GD") was a street gang in Knoxville and that the victim "used to be GD," and he said that "six oh" referred to the "Rollin 60 Crips," another street gang in Knoxville. Investigator Terry explained that the expression, "So the only reason [the Defendant] did that to [the victim] was to show his ass in front of y'all" meant "an act to gain notoriety." He also said that a "big homey" is supposed to keep people in line. He explained, "Very often people [who get robbed] don't call the police if . . . they are robbers themselves, if they have warrants, if they are associated with criminal activity." He stated that he had seen the victim at other hearings in this case, but he was unable to locate the victim to testify at trial.

On cross-examination, Investigator Terry explained that the Defendant and co-defendant Bennett were family members and that co-defendant McCoy and the victim knew each other. He stated that he interviewed Reynolds and the victim but that he did not interview them together, and he did not remember whether Reynolds heard the victim's statement. Upon refreshing his recollection, Investigator Terry believed that Reynolds did overhear his conversation with the victim. Defense counsel pressed Investigator Terry about the presence of a "third individual" running through the woods near the crime scene on the night of the offense, and Investigator Terry insisted that another officer included this information in his report. Based on the information Investigator Terry received from the victim and Reynolds, he did not follow up on the other officer's information. Investigator Terry also did not interview another individual mentioned in the other officer's report. Following this testimony, the State rested its case in chief.

The Defendant, who was seventeen years old at the time of these offenses, testified that codefendants Bennett and McCoy were both his cousins, that the victim's brother was his cousin, and that he had known Reynolds for "a while." The Defendant met the victim and Reynolds at a house party on May 8, 2016. The Defendant brought a gun to the party because the victim asked him to bring one, but he said he did not plan on using it and he did not know why the victim wanted him to bring it. He denied getting into an argument with the victim at the party, but he said that some people he went to school with did get into an argument. The Defendant said that, when the police arrived at the party, people started running out the back door, and he gave his gun to Reynolds because "[he] didn't want to get caught with it, and she was a girl. [He] didn't think they'd stop her and talk to

her." He did not recall seeing the victim give Reynolds any money. The Defendant then walked to the car with his girlfriend, the victim, and Reynolds, and the victim told the Defendant that he was "going [to] be mad" because "[Reynolds] got stopped by police and had to throw the gun." The Defendant said that there were no problems between him and the victim until that point, and they were getting along "real good." He said he was not initially mad about the gun, stating, "What else would you expect somebody to do?"

The Defendant stated that they were going to wait for the police to leave so that they could search for his gun, but they ended up leaving the party and going to Reynolds' house. He said that everything was fine until he asked the victim and Reynolds why they left without going back to get his gun. He said, "[I]t was something fishy about it anyway, 'cause I never seen her stop from walking down the hill or never noticed the police stop a group of people or anybody." He explained that he needed the gun to protect himself based on the neighborhood he grew up in. The Defendant said that, when he started asking the victim for his gun back, the victim told him that he was not going to help him go back and find the gun. The Defendant called codefendant Bennett for a ride because he was "feeling [himself] get mad." He said he did not tell codefendant Bennett that he was upset, and he did not know who codefendant Bennett was with at the time.

When codefendant Bennett arrived, the Defendant, the victim, and Reynolds went outside to the car. The Defendant said, "And as I'm walking up, I'm walking behind them, and the light shine on [the victim's] hip, and I see my gun." He said he "couldn't believe it," and he "felt like they was [sic] testing [his] intelligence." The Defendant went to the car and asked codefendant McCoy "Do you have a gun?" Codefendant McCoy responded, "No. Why[,]" and the Defendant opened the car door and saw the gun and grabbed it. The Defendant explained that he did not know that codefendant McCoy was going to be in the car with codefendant Bennett, and he stated that the gun he took from the car was the one shown in the photographs. With the gun in his hand behind his leg, the Defendant walked around the passenger side of the car, saw the victim talking to codefendant Bennett, and the Defendant said, "I need my gun." He said that the victim did not hear him, so he repeated himself, and the victim said, "What you talking about?" The Defendant said that the victim then turned to face him and that they were "within the wheels of the car" of each other. He stated that the victim turned toward him, the Defendant "upped" his gun, and he saw the victim reaching for his gun, so "that's how the first shot hit his arm." The Defendant continued:

> I just took off and kept shooting. [The victim] was running, but like, as he [was] running, it's like he -- he still reaching. So I took off running and kept shooting behind my back. Where as I'm running, I'm shooting like this 'cause the gun is in my -- I'm right handed. So the gun is in my right hand. So I'm shooting like this.

The Defendant said he was shooting behind him as he ran because he "didn't want to get shot." He knew that the first shot hit the victim, but he did not know if any other shots hit him. The Defendant then ran until he got home.

The Defendant said that his gang membership had nothing to do with why he wanted his gun back from the victim, and he was upset because the victim had lied to him about the gun. He explained that he was not trying to hurt the victim but that he just wanted to scare him into giving the gun back. The Defendant said that the victim did not see him walking up to him, so he believed he could have shot him without the victim knowing. He said he "wasn't thinking" when he shot the victim, he did not want him to die, and he did not aim for his head or his chest. He also said he did not "do or say anything with the intent of communicating with [codefendants McCoy and Bennett] what was about to happen[.]"

On cross-examination, the Defendant said that he retrieved codefendant McCoy's gun from "where the door pocket is when the door's shut." The Defendant said that he never mentioned the victim's money or a gun when he called codefendant Bennett for a ride. The Defendant testified that he joined the Rollin 60 Crips on January 7, 2016, but he was no longer a member of the gang at the time of trial. He stated that he had gang tattoos that said "Rich Rollin" on his arms but that he had these covered up when he was on bond for this case. He agreed that he posted Facebook videos with his "gang buddies" after he joined, including videos with codefendants McCoy and Bennett, but he insisted that they were his cousins and not "gang buddies." He did not know whether codefendants McCoy and Bennett were gang members, and he did not recall making a previous statement that they were members of the Rollin 40 Crips. The Defendant affirmed that he had purchased and possessed multiple firearms in the past, including the gun that the Defendant said he brought to the party in this case. He said, "The gun that I allegedly shot [the victim] with was not the gun I purchased. That's the gun that he had in his holster."

The Defendant said that the victim told him about the house party and asked him if he knew where he could get a gun. The Defendant was adamant that he did not get into an argument with the victim at the party, and he said that nothing happened at the party that made him angry at the victim. He also confirmed that everything was "cool" when they arrived at Reynolds' house. The Defendant said he spoke to codefendant Bennett twice on the phone and that he only asked him for a ride. He stated that he walked to the passenger side of codefendant Bennett's car because he did not know that anyone else would be in the car. When he saw codefendant McCoy in the passenger seat, he asked him if he had a gun. The Defendant said he was frustrated because the victim and Reynolds lied to him about his gun, and he wanted a gun so he could confront the victim about giving his gun back. He said he did not point his gun at the victim and that he saw the victim reaching for his gun when he shot him. He explained that "[the victim] never pointed a gun [at him]

[because] [the Defendant] never gave him a chance[.]" The Defendant denied saying that the victim "started shooting when [the victim] reached for [him] and [the victim] didn't have a gun." He agreed that he shot the victim five times and that five shell casings were found at the crime scene. The Defendant denied that he got into codefendant Bennett's car after he shot the victim. He said that the gun that he brought to the party that night was a .38 revolver. The Defendant saw the victim at the Defendant's juvenile transfer hearing, and he stated that the victim did not have trouble walking at that time. Following his testimony, the Defendant rested.

On rebuttal by the State, Knox County Sheriff's Office (KCSO) Detective Thomas Walker, a detective in the gang investigation unit certified as an expert in gang investigations, explained what a gang was and the categories that were used to determine if a person was a member of a gang. He described the gang culture in Knox County, discussing the Crips in particular. He also stated that a "big homey" was a "lower ranking gang member" who recruited new members in order to "gain status in the gang." He said that the job of the big homey was to "guide that younger gang member into the rules of the gang, what he's expected to do, and then who he has to follow their leads and stuff thereof, and who their-- who the rivals are." He also said that younger gang members were expected to do "pretty much anything the big homey [said][,]" which included committing crimes and that this allowed younger members to gain status in the gang. Investigator Walker also described the role of retaliation in gang culture. He stated that Crips and Gangster Disciples "will cooperate with each other as long as it's profitable for both gangs to cooperate with each other, but usually they're [] rival gangs."

Detective Walker testified that the Defendant admitted that he was in a gang and that he had "pictures of [the Defendant] throwing hand gang signs [and] wearing gang colors." He also said that the Defendant had a felony criminal history. Detective Walker explained that he developed a gang file on the Defendant when he became an adult and that the juvenile court system previously kept a gang file on the Defendant. He stated that the Defendant admitted that he was a gang member when he was booked into jail as an adult and that the Defendant had "gang related" tattoos. He said that the Defendant still had the gang tattoos at the time of his trial. On cross-examination, Detective Walker agreed that the Defendant's prior criminal history consisted of juvenile crimes only. He agreed that a gang member could commit a crime unrelated to his or her gang membership.

Investigator Terry, who also testified on rebuttal, brought the holster that was recovered from the crime scene, and he also brought a revolver "similar to the one described by [the Defendant][.]" He said that the holster was made for a semiautomatic handgun, and the revolver did not fit into the holster properly. The holster was entered into evidence. On cross-examination, Investigator Terry agreed that there were many different types of revolvers. Defense counsel attached the holster to his hip and put the revolver into

the holster, but Investigator Terry stated that the gun was "forced into [the] holster." He ultimately agreed that, if the cylinder was smaller, the revolver would not have to be forced into the holster. On rebuttal, Reynolds testified that she never took possession of a gun at the house party, and she did not see the Defendant or the victim with a firearm at the party. She stated that the first time she saw a gun that night was when the Defendant shot the victim. She acknowledged that the victim had a holster on his side, but she never saw a gun in the holster that night. She said she never saw codefendant Bennett with a gun.

Following deliberations, the jury convicted the Defendant of attempted voluntary manslaughter (Count 1) as a lesser included offense of attempted first-degree murder, employment of a firearm during the commission of or attempt to commit a dangerous felony (Count 2), possession of a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony (Count 3), and two counts of especially aggravated robbery (Counts 4 and 5).[3] The trial court held a sentencing hearing on June 29, 2018, during which the trial court merged Count 5 into Count 4 and Count 3 into Count 1. The trial court sentenced the Defendant to six years' imprisonment for Count 2, which was ordered to be served consecutively to Count 1. The trial court sentenced the Defendant to a concurrent term of seventeen years' imprisonment for Count 4 and four years for Count 1, for a total effective sentence of seventeen years' imprisonment. On February 6, 2020, the trial court conducted a hearing on the Defendant's motion for new trial, which was denied. The Defendant filed a timely notice of appeal, and his case is now properly before this court for our review.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant asserts that the evidence is insufficient to support his convictions for especially aggravated robbery.[4] He states, "[T]he proof does not establish, under any light, that [the victim] suffered serious bodily injury as defined in [Tenn. Code Ann.] § 39-11-106(a)(36)." He also argues that the State did not prove that the victim's foot was broken when he went to the hospital after the shooting and that "the proof is lacking in a causal nexus between [the victim's] time in the wheelchair and the shooting." The State responds the proof was more than sufficient for a rational jury to find beyond a reasonable doubt that the victim suffered serious bodily injury as the result of the Defendant's attack. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that

---

[3] Codefendants McCoy and Bennett were acquitted on all counts.

[4] The Defendant does not challenge the sufficiency of the evidence as it relates to any of his other convictions.

- 10 -

the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant here, especially aggravated robbery requires the State to prove a robbery that was "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffer[ed] serious bodily injury." Tenn. Code Ann. §§ 39-13-403(a)(1), (2). Especially aggravated robbery requires proof of both elements: use of a deadly weapon and serious bodily injury to the victim. See Stewart v. State, 33 S.W.3d 785, 792 (Tenn. 2000). "Robbery" is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2010). "Bodily injury" is defined to include "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2) (2010). "Serious bodily injury" is defined as "bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; [or] (E) Protracted loss or

substantial impairment of a function of a bodily member, organ or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(34); State v. Farmer, 380 S.W.3d 96, 100-01 (Tenn. 2012).

Here, the Defendant does not dispute that he shot the victim or that there was "some proof of a taking"; instead, he only challenges the element of serious bodily injury. The Defendant contends that his actions did not cause a substantial risk of death because no one testified to this effect and because the victim was hospitalized for less than five hours. He notes that the victim did not testify and no witnesses testified that the victim experienced protracted unconsciousness or extreme physical pain. He asserts that there was no proof of protracted or obvious disfigurement or of protracted loss or substantial impairment of a function of a bodily member. He states that when the victim's mother said that the victim was in a wheelchair there was also proof that the victim was going places and performing shows during this time. He contends that this proof is merely evidence of bodily injury but does not rise to the level of serious bodily injury. Relying on State v. Sims, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995), the Defendant states that "the list of types of serious bodily injury must be construed as . . . coming from the same class." He contends "evidence that a man used a wheelchair and crutches for a few months is not the same sort of impairment or loss of a bodily member that would be in the class of substantial risk of death."

Relying on the victim's medical records and witness testimony, the State contends that there was "more than sufficient evidence of both 'extreme physical pain' and 'protracted loss or substantial impairment of a function of a bodily member.'" The State asserts that "the victim's medical records show that he was shot at least five times[,]" that "[p]ain was noted as a symptom of his injuries[,]" and "x-rays revealed that numerous 'ballistic fragments' remained in the victim's legs." The State also notes that the victim's mother and Reynolds each testified as to the extensive nature of the victim's injuries.

The distinction between "bodily injury" and "serious bodily injury" is generally a question of fact for the jury and not one of law. State v. Barnes, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997). This Court has explained that when determining whether a victim's injuries amount to serious bodily injury the "subjective nature of pain is a question of fact to be determined by the trier of fact." State v. Goff, No. W2020-00153-CCA-R3-CD, 2020 WL 7040981, at *4 (Tenn. Crim. App. Nov. 30, 2020) (citing State v. Ryan Love, No. E2011-00518-CCA-R3-CD, 2011 WL 6916457, at *4; see State v. Eric A. Dedmon, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006) ("The difference between 'physical pain' and 'extreme physical pain' is analogous to the difference between 'bodily injury' and 'serious bodily injury,' and as such, determining the severity of pain suffered is within the province of the jury.")) Based upon its verdict, the jury clearly found that the injuries that the victim suffered as a result of being shot five times by the Defendant, including the loss of the use of his legs for several months, the loss of the use of his right hand for over a year, and "a lot of pain," sufficient

- 12 -

to find that the victim suffered serious bodily injury. Additionally, the jury accredited the testimony that the victim fractured his foot as a result of the Defendant's actions, as was within its province. Accordingly, the evidence is sufficient to support the Defendant's convictions for especially aggravated robbery, and he is not entitled to relief on this issue.

**II. Jury Instructions.** Next, the Defendant argues that there were multiple errors in the jury instructions, while the State contends that the trial court accurately instructed the jury. The right to trial by jury is guaranteed by the United States and Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. It follows that a defendant also has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). Because questions regarding the propriety of jury instructions are a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013) (citing State v. Rogers, 188 S.W.3d 593, 628-29 (Tenn. 2006); State v. Thacker, No. E2011-02401-CCA-R3-CD, 2012 WL 4078440, at *8 (Tenn. Crim. App. Sept. 18, 2012)).

When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987) (citation omitted); see State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). "'An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" State v. Majors, 318 S.W.3d 850, 864-65 (Tenn. 2010) (quoting State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005)); see State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531, 544 (Tenn. 1977)).

**a. Serious Bodily Injury.** The Defendant asserts that the trial court incorrectly instructed the jury on the definition of serious bodily injury. Relying on State v. Farmer, 380 S.W.3d 96 (Tenn. 2012), the Defendant states, "Determining whether serious bodily injury was present based on the substantial risk of death requires looking to the injury which actually occurred, not the injury which could have occurred from the conduct." He asserts that "the only possible basis for serious bodily injury in this case was the substantial risk of death" and that "the jury, without adequate guidance, may wrongly conclude that a gunshot wound is a per se substantial risk of death." The Defendant contends that the trial court should have added the following language to the jury instruction on serious bodily injury: "In determining whether there was a serious bodily injury[,] you must look to the injury which actually occurred rather than the injury which could have occurred." In response, the State contends that the trial court properly instructed the jury on the definition of serious bodily injury and that "[the Defendant's] proposed special jury instruction was not an accurate summation of the law[,]" as it was

"an overbroad statement of the law." The State also argues that the Defendant "risked waiver of this issue by failing to include the parties' opening and closing arguments in the trial transcripts" because "without a complete record, it is unclear whether the State even asked the jury to find that serious bodily injury occurred based on a 'substantial risk of death.'"

> The trial court gave the following instruction to the jury on serious bodily injury: "Serious bodily injury" means bodily injury that involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty.

As we discussed in the previous section, this is the definition of serious bodily injury as set out in Tennessee Code Annotated section 39-11-106(a)(34). As we also discussed, the evidence presented at the Defendant's trial was sufficient to support his convictions for especially aggravated robbery and to support the jury's determination that the victim suffered serious bodily injury. The Defendant's main issue here is that a gunshot wound does not always constitute a substantial risk of death, as discussed in Farmer, 380 S.W.3d 96. However, as discussed in the previous section, a substantial risk of death was not the only basis upon which the jury could have concluded that the victim suffered serious bodily injury. Additionally, Farmer says nothing about changing the jury instructions to include the language proposed by the Defendant. Accordingly, we conclude that the jury instructions given to the jury on serious bodily injury were proper, and the Defendant is not entitled to relief on this issue.

**b. Flight.** The Defendant also asserts that the trial court erred in instructing the jury on flight, as he states that "there was no proof of a subsequent hiding out [in the community] anywhere in the transcript." The State responds, "[E]ven if the proof were insufficient to warrant a flight instruction, any error was harmless." The State also asserts that "the language of the jury instruction on flight is 'relatively benign[,]'" as it "clearly required that the jury find that [the Defendant] not only left the scene but also that he engaged in evasion or concealment to avoid arrest or prosecution[, and] [t]he instruction also advises the jury that flight does not necessarily reflect knowledge of guilt."

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence exists supporting a jury instruction on flight where there is evidence of "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown." State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (internal quotation, emphasis, and citation omitted). The State may satisfy the subsequent hiding out, evasion,

- 14 -

or concealment requirement by presenting proof from which a jury might infer that the defendant committed such acts. State v. Payton, 782 S.W.2d 490, 498 (Tenn. 1989); Rogers v. State, 455 S.W.2d 182, 186-87 (Tenn. Crim. App. 1970).

The trial court gave the following jury instruction regarding flight:

The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

We note that the aforementioned instruction has been cited with approval by this court. See State v. Kendricks, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996) (citing State v. Payton, 782 S.W.2d 490, 497-98 (Tenn. Crim. App. 1989); State v. Whittenmeir, 725 S.W.2d 686, 688 (Tenn. Crim. App. 1986)).

Following our review, we conclude that the evidence presented at trial was sufficient to support the jury instruction on flight. The Defendant admitted to shooting the victim and fleeing the crime scene, running until he reached home. Although the Defendant contends that the evidence does not support that he was hiding out in the community, the facts presented at trial could support the conclusion that the Defendant was hiding out to

avoid prosecution.  Additionally, given the language of the specific instruction and the overwhelming proof of the Defendant's guilt, any error in giving the instruction was harmless.  See State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1994) (concluding that the trial court's instruction on flight, coupled with the overwhelming evidence of the defendant's guilt, rendered any error regarding the instruction harmless).  The Defendant is not entitled to relief on this issue.

## CONCLUSION

Upon a thorough review of the relevant facts and applicable law, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE